AO 106 (Rev. 04/10)  Application for a Search Warrant (USAO CDCA Rev. 01/2013)

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>5863 Normandie Place, Riverside, CA 92504, as described<br>more fully in Attachment A-1 | )<br>)<br>)      Case No.  5:18-MJ-00401<br>)<br>)<br>) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-1

located in the _____Central_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B-1

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. Section 841(a)(1) | Possession with the intent to distribute a controlled substance |

The application is based on these facts:

See attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Special Agent Paul Kirwan
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____

_____
*Judge's signature*

City and state:  Riverside, California

Hon. Kenly Kiya Kato, U.S. Magistrate Judge
*Printed name and title*

AUSA: B. Balding, x2274

ATTACHMENT A-1

PREMISES TO BE SEARCHED

5863 Normandie Place, Riverside, CA 92504 (the "SUBJECT PREMISES"), a single-story home with a white-colored garage door, as pictured below.  The front door has black-colored reinforced bars.  The residence is of lighter color whitish green.  The front yard is dirt.  The house numbers are written on the curb in front of the house, but are faded.  The premises to be searched includes all vehicles parked on the property or in the driveway, as well as all storage sheds, safes, and structures on the property.



## ATTACHMENT B-1

### I.   ITEMS TO BE SEIZED

1.   The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (Possession with Intent to Distribute Controlled Substances) and 846 (Conspiracy and Attempt to Distribute Controlled Substances) and 18 U.S.C. § 922(g)(1) (Felon in Possession of a Firearm or Ammunition), 924(c) (Use of a Firearm in Furtherance of a Drug trafficking Crime), 1028 (Fraud and Related Activity in Connection with Identification Documents, Authentication Features, and Information), 1029 (Access Device Fraud), and 1028A (Aggravated Identity Theft) (the "Subject Offenses"), namely:

a.   Any controlled substance, controlled substance analogue, or listed chemical;

b.   Items and paraphernalia for the manufacturing, distributing, packaging, sale, or weighing of controlled substances, including scales and other weighing devices, plastic baggies, food saver sealing devices, heat sealing devices, balloons, packaging materials, containers, cutting agents, and money counters;

c.   Items used in the packaging of currency for consolidation and transportation, such as money-counting machines, money wrappers, carbon paper, rubber bands, duct tape or wrapping tape, plastic wrap or shrink wrap, and plastic sealing machines;

d.    United States currency over $1,000 or bearer instruments worth over $1,000 (including cashier's checks, traveler's checks, certificates of deposit, stock certificates, and bonds) (including the first $1,000), and data, records, documents, or information (including electronic mail, messages over applications and social media, and photographs) pertaining to, obtaining, possessing, using, applications for, or transferring money over $1,000, such as bank account records, cryptocurrency records and accounts;

e.    Any firearms, ammunition, or firearm parts or accessories;

f.    Documents and records reflecting the identity of, contact information for, communications with, or times, dates or locations of meetings with co-conspirators, sources of supply of controlled substances or firearms, or drug or firearms customers, including calendars, address books, telephone or other contact lists, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and/or times when drugs, guns, or ammunition, were bought, sold, or otherwise distributed, whether contained in hard copy correspondence, notes, emails, text messages, photographs, videos (including items stored on digital devices), or otherwise;

g.    Data, records, documents, or information (including electronic mail and messages) pertaining to, obtaining, possessing, using, applications for, or transferring personal and/or financial transaction identification information

for persons other than YARDE, such as names, driver's license
numbers, identification cards, addresses, phone numbers, credit
cards and debit card numbers, security codes, bank account and
other financial institution account numbers, merchant processor
accounts, billing statements, bank or credit card statements,
passwords or passcodes, Social Security numbers, email
addresses, IP addresses, as well as PIN numbers and passwords
for financial institutions or internet service providers;

   h. Data, records, documents (including e-mails), or
information reflecting or referencing bank accounts, credit card
accounts, or other financial accounts, or purchases of
merchandise, securities, electronic currency, and other valuable
things;

   i. Software, devices, or tools such as computers,
printers, scanners, embossing machines, credit card readers or
encoders, washing chemicals, or imprinting tools, used or
intended to be used to alter, counterfeit, or create fraudulent
checks, access devices, or other monetary instruments;

   j. Any altered, counterfeit, or fraudulent
identifications, checks, access devices, monetary instruments,
or other official documents;

   k. Records of off-site storage locations, including
safe-deposit box keys, records, receipts, or rental agreements
for storage facilities;

   l. Records, documents, programs, applications and
materials, or evidence of the absence of same, sufficient to
show call log information, including all telephone numbers

iii

dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

m.    Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital devices and which relate to the above-named violations;

n.    Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received from any digital device and which relate to the above-named violations;

o.    Any indicia of occupancy, residency, or ownership of the SUBJECT PREMISES or any other premises or locations, used to facilitate the Subject Offenses, including, forms of personal identification, records relating to utility bills, telephone bills, loan payment receipts, rent receipts, trust deeds, lease or rental agreements, addressed envelopes, escrow documents, keys, letters, mail, canceled mail envelopes, personal belongings, and personal photographs;

p.    Audio recordings, pictures, video recordings, or still captured images related to the Subject Offenses;

q.    Contents of any calendar or date book;

r.    Global Positioning System ("GPS") coordinates and

iv

other information or records identifying travel routes, destinations, origination points, and other locations; and

       s.   Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offense/s, and forensic copies thereof.

       t.   With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

       i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

       ii.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

       iii. evidence of the attachment of other devices;

       iv.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

       v.   evidence of the times the device was used;

       vi.   passwords, encryption keys, biometric keys and other access devices that may be necessary to access the device;

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

viii.     records of or information about Internet Protocol addresses used by the device;

ix.   records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.   As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and

connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## II.   SEARCH PROCEDURE FOR DIGITAL DEVICES

4.   In searching digital devices (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and

vii

attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

        ii.  The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

        iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

        c.    If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

        d.    If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

        e.    If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.    If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.    The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.    After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

5.    In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.    Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b.    Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

      c.   Any magnetic, electronic, or optical storage device capable of storing digital data;

      d.   Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

      e.   Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

      f.   Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

      g.   Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

6.   During the execution of this search warrant, law enforcement personnel are authorized to: (1) depress YARDE's thumb- and/or fingerprints onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of YARDE's face with his eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.

7.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

## AFFIDAVIT

I, Paul Kirwan, being duly sworn, declare and state as follows:

### I.   PURPOSE OF AFFIDAVIT

1.    This affidavit is made in support of a criminal complaint against Gregory Yarde ("YARDE") for a violation of 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute a Controlled Substance.

2.    This affidavit is also made in support of an application for a warrant to search YARDE's residence, 5863 Normandie Place, Riverside, CA 92504 (the "SUBJECT PREMISES"), as described more fully in Attachment A-1.

3.    This affidavit is also made in support of an application for a warrant to search the following digital devices in the custody of the Riverside Police Department ("RPD") in Riverside, California, (collectively, the "SUBJECT DEVICES") as described more fully in Attachment A-2:

     a.    One black Android cell phone ("SUBJECT DEVICE 1"), seized on September 22, 2018;

     b.    One silver and gold Samsung Galaxy S7 Edge cell phone ("SUBJECT DEVICE 2"), seized on September 7, 2018.

4.    The requested search warrants seek authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (Possession with Intent to Distribute Controlled Substances) and 846 (Conspiracy and Attempt to Distribute Controlled Substances) and 18 U.S.C. § 922(g)(1) (Felon in Possession of a Firearm or Ammunition), 924(c) (Use of a Firearm in Furtherance of a Drug trafficking Crime), 1028

(Fraud and Related Activity in Connection with Identification
Documents, Authentication Features, and Information), 1029
(Access Device Fraud), and 1028A (Aggravated Identity Theft)
(the "Subject Offenses"), as described more fully in Attachment
B-1 for the SUBJECT PREMISES and B-2 for the SUBJECT DEVICES.
Attachments A-1, A-2, B-1, and B-2 are incorporated herein by
reference.

　　　5.　　The facts set forth in this affidavit are based upon
my personal observations, my training and experience, and
information obtained from various law enforcement personnel and
witnesses.　This affidavit is intended to show merely that there
is sufficient probable cause for the requested complaint and
search warrants, and does not purport to set forth all of my
knowledge of or investigation into this matter.　Unless
specifically indicated otherwise, all conversations and
statements described in this affidavit are related in substance
and in part only.

## II. BACKGROUND OF AFFIANT

　　　6.　　I am a Special Agent ("SA") with the Bureau of
Alcohol, Tobacco, Firearms & Explosives ("ATF"), and have been
so employed since May 2017.

　　　7.　　I am a graduate of the Federal Law Enforcement
Training Center and the ATF National Academy.　I am an ATF
Interstate Nexus Expert, and routinely examine firearms and
ammunition to determine their origins and travel in interstate
commerce.　During my time as an ATF SA, I have testified as an
expert witness in federal court, participated on multiple

2

different task forces and assisted in multiple narcotics and firearms investigations.  Based on my training and experience, and on my conversation with other ATF SAs, I am familiar with the investigation of federal firearms and drug crimes, and with the ways in which people who commit those crimes use their residences, vehicles, and digital devices to facilitate and conceal their activity.

### III. SUMMARY OF PROBABLE CAUSE

8.   On September 22, 2018, RPD officers attempted a traffic stop of a car YARDE was driving, but YARDE fled.  After YARDE was apprehended, officers conducted an inventory search of the car and found a black computer bag.  The bag contained approximately 135.4 grams of a substance that field tested positive for methamphetamine, a suspected "pay-owe sheet," and credit cards and a social security card bearing YARDE's name. Officers also found SUBJECT DEVICE 1 in the center console of the car.

9.   Approximately one month earlier, on August 23, 2018, an ATF undercover agent ("UC") purchased approximately 113.4 grams of suspected methamphetamine from YARDE at the SUBJECT PREMISES.  During the transaction, the UC saw indications of identity theft at the SUBJECT PREMISES, such as a credit card skimmer machine.  YARDE told the UC that YARDE lived at the SUBJECT PREMISES.  A Confidential Informant (the "CI") further confirmed that YARDE lives at the SUBJECT PREMISES.

10.   In addition, on September 7, 2018, RPD stopped a car YARDE was driving.  When YARDE got out of the car, a set of keys

fell from his lap.  Inside the car were multiple occupants and a
safe that could be opened with the key that fell from YARDE's
lap; the safe contained methamphetamine, heroin, and firearms.
Officers found SUBJECT DEVICE 2 near the driver's seat area.

## IV. STATEMENT OF PROBABLE CAUSE

11.   Based on my review of law enforcement reports,
conversations with other law enforcement agents, and my own
knowledge of the investigation, I am aware of the following:

**A.   YARDE Was Arrested on September 22, 2018 After Fleeing
in a Car Containing Methamphetamine and SUBJECT
DEVICE 1**

### 1.   Vehicle Pursuit and Foot Pursuit of YARDE

12.   On September 22, 2018, at approximately 5:42 p.m., RPD
Officer Chen attempted to execute a traffic stop on a driver
later identified as YARDE for making an illegal left turn
crossing a double solid yellow line, a violation of the
California Vehicle Code.  Officer Chen activated his overhead
forward facing red light and siren signaling the vehicle to pull
over.  YARDE failed to yield and accelerated at a high rate of
speed through a parking lot and eventually into a dead end in a
residential neighborhood.  YARDE then reversed the vehicle
toward Officer Chen's marked police vehicle.  The driver's side
window of the vehicle was rolled down and Officer Chen could see
the driver's face; he immediately recognized the driver as YARDE
from a previous arrest and vehicle pursuit that occurred on
September 7, 2018 (described below), in which YARDE was found in
possession of three stolen firearms as well as controlled

substances.  YARDE has multiple felony convictions and is
prohibited from possessing firearms and ammunition.

13.  Officer Chen heard YARDE yelling and stating that
Officer Chen would have to shoot him.  YARDE then drove the car
into a dirt area of a residential property and YARDE and the
other occupant of the car fled the car on foot.  Despite Officer
Chen's verbal commands to stop and get on the ground, both
occupants continued to flee the scene.  YARDE jumped over a
fence and continued running away.  Officer Chen was able to
detain the female passenger, later identified as Michelle
Shriver ("Shriver").  Once Shriver was taken into custody,
Officer Chen was informed by RPD Dispatch through his radio that
the vehicle previously had been reported stolen by carjacking.
After an extensive area check with the assistance of multiple
other RPD Officers, YARDE was found exiting a hookah bar and was
taken into custody at gunpoint.

14.  Officer Chen conducted a search incident to arrest of
Shriver and the purse she was holding when she fled from the
car.  The purse was located on the ground where Shriver was
taken into custody, and contained identity theft items as well
as syringe loaded with suspected heroin and a small bag
containing approximately 0.7 grams of suspected methamphetamine.
Officer Chen also found in Shriver's purse a zip lock bag which
he believed Shriver attempted to toss under the vehicle prior to
her arrest.  The zip lock bag contained approximately 55.9 grams
of a substance that was tested using a department-issued NIK Kit
"U" and resulted in a positive test for methamphetamine.

2.   Search of Stolen Car

15.   Officer Chen conducted an inventory search of the car, and in the center console he found SUBJECT DEVICE 1 and a California ID Card belonging to YARDE.

16.   In the back seat, passenger side, Officer Chen found a black computer bag.  Inside one of the pouches in the bag, he found a white sock containing a large amount of a clear white crystalline substance, which Officer Chen recognized to be methamphetamine.  Also in that same bag that contained the methamphetamine were credit cards and a social security card, all of which had YARDE's name on them.  The bag also contained a notebook that appeared to be a "pay/owe sheet" that drug dealers often use to keep track of transactions.

17.   RPD officers conducted a test of the suspected methamphetamine from the sock and weighed it; a test using a department-issued NIK Kit "U" resulted in a positive test for methamphetamine; Officer Chen weighed the suspected methamphetamine and it weighed approximately 135.4 grams.  Based on my training and experience, this is not a personal use amount of methamphetamine.

3.   YARDE and Shriver Made No Statements

18.   YARDE and Shriver both invoked their Miranda rights and did not make any statements to law enforcement concerning the arrest.

**B. An ATF Undercover Agent Purchased Methamphetamine from YARDE at the SUBJECT PREMISES on August 23, 2018**

19. On August 23, 2018, a CI working with the ATF successfully introduced an ATF Special Agent as a UC to YARDE.[1] The CI negotiated a deal for the sale of four ounces of methamphetamine with YARDE and introduced the UC as the buyer. The CI and UC went to YARDE's residence (the SUBJECT PREMISES) together to conduct the transaction. The UC purchased approximately four ounces of methamphetamine for $700 from YARDE inside of YARDE's current residence at the SUBJECT PREMISES. The controlled purchase was audio and video recorded by the UC.

20. During the transaction, YARDE discussed the drug business he was running, and gave the UC a phone number to contact YARDE directly for future transactions. Inside the SUBJECT PREMISES, the UC also saw items he recognized to be indicative of identity theft, including a credit card skimmer machine.

21. Also at the SUBJECT PREMISES on August 23, 2018, YARDE told the UC that YARDE recently had moved into the SUBJECT PREMISES because of ongoing marital issues with his wife. The UC also stated that it appeared from items at the SUBJECT PREMISES, such as the bedroom and personal effects, that YARDE has moved into the SUBJECT PREMISES and was living at the SUBJECT PREMISES.

---

[1] The CI is being paid to assist law enforcement. The CI has convictions for at least the following crimes: vehicle theft, possession of controlled substances paraphernalia, knowingly receiving stolen property, burglary, and credit card and identity theft.

22.   At the conclusion of the controlled purchase at the SUBJECT PREMISES, I weighed the suspected methamphetamine and it weighed approximately 113.4 grams.   The methamphetamine was packaged and delivered to a laboratory for official testing, the results of which are pending.   Due to safety concerns, including the possibility that the package containing the drugs could contain fentanyl, a dangerous synthetic opiate that can be lethal even in very small doses, the drugs were not field-tested.

**C.   YARDE Stopped in a Car with Methamphetamine, Firearms, and SUBJECT DEVICE 2 on September 7, 2018**

23.   On September 7, 2018, Officer Chen executed a traffic stop on a car YARDE was driving for failure to wear a seatbelt by the backseat passenger, failure to signal after multiple lane changes in a high traffic school zone, having a license plate reflector coating tampered and altered, and having hanging objects from the rearview mirror obstructing the view, all violations of the California Vehicle Code.   Officer Chen activated his overhead forward facing red light and siren, signaling the car to pull over.   YARDE failed to yield and began driving dangerously in an apparent attempt to evade Officer Chen.   During the pursuit, YARDE failed to stop at multiple stop signs.   Officer Chen observed the occupants in the car reaching around during the pursuit, which appeared to look like the occupants were concealing objects inside the car.   Officer Chen also observed the driver reaching over to the front passenger

side near front passenger floorboard.  A black bag was also observed being handed back and forth between the passengers.

24.   YARDE ultimately pulled over and a high risk stop was conducted.  YARDE was called out of the car and got out and in doing so, a white and red lanyard with a set of keys attached to the end of it fell out of YARDE's lap onto the ground.  The front seat passenger, identified as Brittany King, was on summary probation with search terms, and the back seat passenger, identified as Christopher Mohan, was on felony probation.  All three individuals were taken into custody.

25.   Officer Chen then searched the car and found multiple jewelry and identity theft items scattered throughout the vehicle.  A safe with a gold chain hanging out of it was found near the passenger side floorboard.  Based on YARDE's attempt to evade law enforcement and the significant amount of jewelry, including the gold chain hanging between the closed opening of the safe, officers suspected the safe was stolen during a residential burglary.

26.   RPD officers opened the safe with a key found on the lanyard that fell from YARDE's lap.  Inside the safe were three handguns, a pistol magazine loaded with seven rounds of .45 ACP caliber ammunition, an unsealed zip lock bag containing approximately 27.8 grams of suspected methamphetamine, and a bag containing approximately 16.1 grams of suspected heroin.  An additional approximately 12.7 grams of suspected methamphetamine that appeared to have leaked from the unsealed zip lock bag was found throughout the safe.  The items appeared to have been

shoved in the safe in a rushed manner, consistent with the observations Officer Chen made while engaging in the vehicle pursuit.

27. RPD officers tested the 27.8 grams of suspected methamphetamine with their department-issued NIK KIT "U" test, and tested the suspected 16.1 grams of suspected heroin with their department-issued NIK KIT "K" test, and both substances tested positive.

28. Based on a previous search of YARDE's criminal history reports available to law enforcement, I know that YARDE has been convicted of multiple felonies and as such is prohibited from possessing firearms and ammunition.

29. The three handguns that were found in the safe had all been reported stolen from a residence in Corona, California, and are:

      a.   A Kimber Raptor II bearing serial number K223192;

      b.   a Smith & Wesson SW1911 bearing serial number UCF4022; and

      c.   a .45 caliber Sig Sauer bearing serial number GS13301.

30. SUBJECT DEVICE 2 was found near the driver front seat area of the vehicle. The other front seat passenger stated that SUBJECT DEVICE 2 did not belong to her.

31. YARDE was read his Miranda rights and waived those rights and agreed to speak with officers about the September 7, 2018 incident. YARDE said he was helping a friend fix her vehicle, that passenger King was a friend with whom he smokes

marijuana, and that he had never met passenger Mohan prior to
September 7, 2018.  YARDE said Mohan paid YARDE twenty dollars
to drive Mohan to Riverside and Mohan had a brand new printer
and a bag with him when he get in the vehicle.  YARDE suspected
Mohan was trying to purchase drugs at the unknown location.

32.  YARDE said that due to his past criminal history and
police contacts, his first instinct was to run after seeing the
lights and hearing the siren.  He said he then realized he did
nothing wrong and had nothing to hide, so he pulled over.  He
said the vehicle did not belong to him, and he did not know what
was inside the vehicle.  He denied knowing about a safe or the
contents of the safe and that he was in possession of the safe
key because it was attached to the vehicle key.  YARDE denied
currently using methamphetamine or ever using heroin.  YARDE
also said he would often tell the passengers in the car times to
put their seatbelts on, but the backseat passenger Mohan did not
do so.

**D.   Further Investigation of the SUBJECT PREMISES**

33.  A search of records from the California Department of
Motor Vehicles lists another address, not the SUBJECT PREMISES,
as YARDE's residence.  However, I believe YARDE is currently
living at the SUBJECT PREMISES because, as described above, an
ATF UC recently purchased methamphetamine from YARDE at the
SUBJECT PREMISES on August 23, 2018 and, during that
transaction, YARDE told the ATF UC that YARDE lived at the
SUBJECT PREMISES, and the UC believes that YARDE lived at the
SUBJECT PREMISES based on the UC's observations.

11

34.   The CI working with law enforcement and involved with the investigation also stated that YARDE had been in fact living at and selling drugs from the SUBJECT PREMISES.

### V.   TRAINING AND EXPERIENCE ON DRUG OFFENSES

35.   Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a.   Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.  Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

b.   Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where the drug trafficker has ready access to them, such as at their residence, in their vehicles, and on their cell phones and other digital devices.

c.   Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the

seller and the buyer, the negotiation of price, and discussion
of whether or not participants will bring weapons to a deal.  In
addition, it is common for people engaged in drug trafficking to
have photos and videos on their cell phones of drugs they or
others working with them possess, as they frequently send these
photos to each other and others to boast about the drugs or
facilitate drug sales.

        d.    Drug traffickers often keep the names, addresses,
and telephone numbers of their drug trafficking associates on
their digital devices.  Drug traffickers often keep records of
meetings with associates, customers, and suppliers on their
digital devices, including in the form of calendar entries and
location data.

        e.    Individuals engaged in the illegal purchase or
sale of drugs, firearms, and other contraband, and those engaged
in identity theft crimes, often use multiple digital devices.

## VI. <u>TRAINING AND EXPERIENCE ON FIREARMS OFFENSES</u>

36.  From my training, personal experience, and the
collective experiences related to me by other law enforcement
officers who conduct who conduct firearms investigations, I am
aware of the following:

        a.    Persons who possess, purchase, or sell firearms
generally maintain records of their firearm transactions as
items of value and usually keep them in their residence, or in
places that are readily accessible, and under their physical
control, such in their digital devices.  It has been my
experience that prohibited individuals who own firearms

illegally will keep the contact information of the individual
who is supplying firearms to prohibited individuals or other
individuals involved in criminal activities for future purchases
or referrals.  Such information is also kept at residences, in
vehicles, and on digital devices.

      b.   Many people also keep mementos of their firearms,
including digital photographs or recordings of themselves
possessing or using firearms on their digital devices.  These
photographs and recordings are often shared via social media,
text messages, and over text messaging applications.

      c.   Those who illegally possess firearms often sell
their firearms and purchase firearms.  Correspondence between
persons buying and selling firearms often occurs over phone
calls, e-mail, text message, and social media message to and
from smartphones, laptops, or other digital devices.  This
includes sending photos of the firearm between the seller and
the buyer, as well as negotiation of price.  In my experience,
individuals who engage in street sales of firearms frequently
use phone calls, e-mail, and text messages to communicate with
each other regarding firearms that the sell or offer for sale.
In addition, it is common for individuals engaging in the
unlawful sale of firearms to have photographs of firearms they
or other individuals working with them possess on their cellular
phones and other digital devices as they frequently send these
photos to each other to boast of their firearms possession
and/or to facilitate sales or transfers of firearms.

## VII. <u>TRAINING AND EXPERIENCE ON IDENTITY THEFT CRIMES</u>

37.   Based on my training and experience and information obtained from other law enforcement officers who investigate mail and identity theft, I know the following:

a.   Individuals involved in mail theft, identity theft, bank fraud, and access device fraud crimes often use digital devices to perpetrate their crimes due to the relative anonymity gained by conducting financial transactions electronically or over the internet.  They often employ digital devices for the purposes, among others, of: (1) applying online for fraudulent credit cards; (2) obtaining or storing personal identification information for the purpose of establishing or modifying fraudulent bank accounts and/or credit card accounts; (3) using fraudulently obtained bank accounts and/or credit card accounts to make purchases, sometimes of further personal information; (4) keeping records of their crimes; (5) researching personal information, such as social security numbers and dates of birth, for potential identity theft victims; and (6) verifying the status of stolen access devices.

b.   It is also common for identity thieves to keep "profiles" of victims on digital devices.  Such "profiles" contain the personal identifying information of victims, such as names, Social Security numbers, dates of birth, driver's license or state identification numbers, alien registration numbers, passport numbers, and employer or taxpayer identification numbers.

c.     It is common for mail thieves, identity thieves, and individuals engaged in bank fraud, access device fraud, and identification document fraud to use equipment and software to print credit and identification cards, to create magnetic strips for credit cards, to use embossing machines to create credit cards, to use laser printers to create checks, and to use magnetic card readers to read and re-encode credit cards. Software relevant to such schemes can often be found on digital devices, such as computers.

d.     Based on my training and experience, I know that individuals who participate in mail theft, identity theft, bank fraud, and access device fraud schemes often have co-conspirators, and often maintain telephone numbers, email addresses, and other contact information and communications involving their co-conspirators in order to conduct their business.  Oftentimes, they do so on their digital devices. Suspects often use their digital devices to communicate with co-conspirators by phone, text, email, and social media, including sending photos.

e.     Those who engage in identity theft crimes often keep evidence of their crimes and proceeds of their crimes where easily accessible, such as in their residences, vehicles, and on their digital devices.

38.   Individuals engaged in identity theft often use multiple digital devices.

VIII.      TRAINING AND EXPERIENCE ON DIGITAL DEVICES

39.   As used herein, the term "digital device" includes the SUBJECT DEVICES" and any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that data in digital form can be stored on a variety of digital devices and that during the search of a premises it is not always possible to search digital devices for digital data for a number of reasons, including the following:

a.    Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment.  There are so many types of digital devices and software programs in use today that it takes time to conduct a thorough search.  In addition, it may be necessary to

17

consult with specially trained personnel who have specific expertise in the type of digital device, operating system, and software application being searched.

b.    Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data.  As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

c.    The SUBJECT DEVICES contain multiple gigabytes of storage space. In addition, the volume of data stored on many digital devices will typically be so large that it will be highly impractical to search for data during the physical search of the premises.  A single megabyte of storage space is the equivalent of 500 double-spaced pages of text.  A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text.  Storage devices capable of storing 500 or more gigabytes are now commonplace. Consequently, just one device might contain the equivalent of 250 million pages of data, which, if printed out, would completely fill three 35' x 35' x 10' rooms to the ceiling. Further, a 500 gigabyte drive could contain as many as approximately 450 full run movies or 450,000 songs.

d.   Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet.[2] Electronic files saved to a hard drive can be stored for years with little or no cost.  Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools.  Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, i.e., space on a hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space, for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a swap or recovery file.  Similarly, files that have been viewed on the Internet are often automatically downloaded into a temporary directory or cache.  The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently downloaded or viewed content.  Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular

---

[2] These statements do not generally apply to data stored in volatile memory such as random-access memory, or "RAM," which data is, generally speaking, deleted once a device is turned off.

user's operating system, storage capacity, and computer habits. Recovery of residue of electronic files from a hard drive requires specialized tools and a controlled laboratory environment.  Recovery also can require substantial time.

        e.    Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processing, picture, and movie files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the digital devices are, as described further in the attachments, called for by this warrant.  Those records will not always be found in digital data that is neatly segregable from the hard drive image as a whole.  Digital data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used.  Web browsers, e-mail programs, and chat programs often store configuration data on the hard drive that can reveal information such as online nicknames and passwords.  Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and

the times the computer was in use.  Computer file systems can record data about the dates files were created and the sequence in which they were created.  This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

       f.   Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device.  For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device.  Evidence of the absence of particular data on a digital device is not segregable from the digital device. Analysis of the digital device as a whole to demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment, and can require substantial time.

       g.   Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt"

21

to conceal the image and make it appear that the file contains text.  Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form.  In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography."  For example, by using steganography a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime.  In addition, decryption of devices and data stored thereon is a constantly evolving field, and law enforcement agencies continuously develop or acquire new methods of decryption, even for devices or data that cannot currently be decrypted.

40.  As discussed herein, based on my training and experience I believe digital devices will be found during the search of the SUBJECT PREMISES and I believe that one or more of these digital devices will be enabled with biometric unlock functionality.

a.   I know from my training and experience and my review of publicly available materials that several hardware and software manufacturers offer their users the ability to unlock

their devices through biometric features in lieu of a numeric or alphanumeric passcode or password.  These biometric features include fingerprint-recognition, face-recognition, iris-recognition, and retina-recognition.  Some devices offer a combination of these biometric features and enable the users of such devices to select which features they would like to utilize.

        b.   If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints.  For example, Apple Inc. ("Apple") offers a feature on some of its phones and laptops called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device.  Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which on a cell phone is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the phone, and on a laptop is located on the right side of the "Touch Bar" located directly above the keyboard.  Fingerprint-recognition features are increasingly common on modern digital devices.  For example, for Apple products, all iPhone 5S to iPhone 8 models, as well as iPads (5th generation or later), iPad Pro, iPad Air 2, and iPad mini 3 or later, and MacBook Pro laptops with the Touch Bar are all equipped with Touch ID. Motorola, HTC, LG, and Samsung, among other companies, also produce phones with fingerprint sensors to enable biometric unlock by fingerprint.  The fingerprint sensors for these

companies have different names but operate similarly to Touch
ID.

      c.   If a device is equipped with a facial-recognition
feature, a user may enable the ability to unlock the device
through his or her face.  To activate the facial-recognition
feature, a user must hold the device in front of his or her
face.  The device's camera analyzes and records data based on
the user's facial characteristics.  The device is then
automatically unlocked if the camera detects a face with
characteristics that match those of the registered face.  No
physical contact by the user with the digital device is
necessary for the unlock, but eye contact with the camera is
often essential to the proper functioning of these facial-
recognition features; thus, a user must have his or her eyes
open during the biometric scan (unless the user previously
disabled this requirement).  Several companies produce digital
devices equipped with a facial-recognition-unlock feature, and
all work in a similar manner with different degrees of
sophistication, e.g., Samsung's Galaxy S8 (released Spring
2017) and Note8 (released Fall 2017), Apple's iPhone X (released
Fall 2017).  Apple calls its facial-recognition unlock feature
"Face ID."  The scan and unlock process for Face ID is almost
instantaneous, occurring in approximately one second.

      d.   While not as prolific on digital devices as
fingerprint- and facial-recognition features, both iris- and
retina-scanning features exist for securing devices/data.  The
human iris, like a fingerprint, contains complex patterns that

are unique and stable.  Iris-recognition technology uses
mathematical pattern-recognition techniques to map the iris
using infrared light.  Similarly, retina scanning casts infrared
light into a person's eye to map the unique variations of a
person's retinal blood vessels.  A user can register one or both
eyes to be used to unlock a device with these features.  To
activate the feature, the user holds the device in front of his
or her face while the device directs an infrared light toward
the user's face and activates an infrared-sensitive camera to
record data from the person's eyes.  The device is then unlocked
if the camera detects the registered eye.  Both the Samsung
Galaxy S8 and Note 8 (discussed above) have iris-recognition
features.  In addition, Microsoft has a product called "Windows
Hello" that provides users with a suite of biometric features
including fingerprint-, facial-, and iris-unlock features.
Windows Hello has both a software and hardware component, and
multiple companies manufacture compatible hardware, _e.g._,
attachable infrared cameras or fingerprint sensors, to enable
the Windows Hello features on older devices.

    41.   In my training and experience, users of electronic
devices often enable the aforementioned biometric features
because they are considered to be a more convenient way to
unlock a device than entering a numeric or alphanumeric passcode
or password.  Moreover, in some instances, biometric features
are considered to be a more secure way to protect a device's
contents.

42.   I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features have been enabled.  This can occur when a device has been restarted or inactive, or has not been unlocked for a certain period of time.  For example, with Apple's biometric unlock features, these circumstances include when: (1) more than 48 hours has passed since the last time the device was unlocked; (2) the device has not been unlocked via Touch ID or Face ID in eight hours and the passcode or password has not been entered in the last six days; (3) the device has been turned off or restarted; (4) the device has received a remote lock command; (5) five unsuccessful attempts to unlock the device via Touch ID or Face ID are made; or (6) the user has activated "SOS" mode by rapidly clicking the right side button five times or pressing and holding both the side button and either volume button.  Biometric features from other brands carry similar restrictions.  Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.   I do not know the passcodes of the devices likely to be found during the search.

43.   In my training and experience, the person who is in possession of a device or has the device among his or her

belongings at the time the device is found is likely a user of the device.

44.    For these reasons, if while executing the warrant, law enforcement personnel encounter a digital device at the SUBJECT PREMISES that may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to: (1) compel the use of YARDE's thumb- and/or fingerprints on the device(s); and (2) hold the device(s) in front of YARDE's face with his eyes open to activate the facial-, iris-, and/or retina-recognition feature. With respect to fingerprint sensor-enabled devices, although I do not know which of the fingers are authorized to access any given device, I know based on my training and experience that it is common for people to use one of their thumbs or index fingers for fingerprint sensors; and, in any event, all that would result from successive failed attempts is the requirement to use the authorized passcode or password.

45.    Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## IX. CONCLUSION

46.    For all of the reasons described above, there is probable cause to believe that Gregory Yarde has committed a violation of 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute a Controlled Substance.    There is also probable cause that the items to be seized described in Attachment B-1 will be

found in a search of the SUBJECT PREMISES described in
Attachment A-1, and that the items to be seized described in
Attachment B-2 will be found in a search of the SUBJECT DEVICES
described in Attachment A-2.


_____
Paul Kirwan, Special Agent
Bureau of Alcohol, Tobacco,
Firearms and Explosives


Subscribed to and sworn before me
this _____ day of September, 2018.


_____
UNITED STATES MAGISTRATE JUDGE